Darwin **COGGER, et al., Relators,**

v.

**COUNTY OF BECKER, Respondent.**

**No. A04–713.**

Supreme Court of Minnesota.

Jan. 20, 2005.

---

Ronald Bradley, Minneapolis, MN, for Relators.

Gretchen D. Thilmony, Asst. Becker County Attorney, Detroit Lakes, MN, for Respondent.

Terrence J. Rheault, Law Office of Charles W. LaDue, Coon Rapids, MN, for amicus curiae White Earth Band of Ojibwe.

## OPINION

MEYER, Justice.

The question presented in this case is whether state law controls in defining whether a manufactured home located within the boundaries of an Indian reservation may be taxed as real property. The tax court found that the county has authority to assess an ad valorem tax on the land in question and it then applied Minnesota statutes to classify the manufactured home as real property. The Coggers appealed the tax court decision by a writ of certiorari. We affirm the tax court.

Darwin and Janet Cogger are members of the White Earth Band of Chippewa Indians. The Coggers own fee patented title to a plot of land within the boundaries of the White Earth Indian Reservation, located in Becker County, Minnesota. In 1993, the Coggers moved a manufactured home onto their land and have occupied the home as their primary residence since that time. The manufactured home is a 28' × 40' "double wide" home with vinyl skirting. In 1998, the Coggers attached an 8' × 6' porch to their home and added three storage sheds and two wooden decks to the property.

In 2002, the Becker County Assessor assessed an ad valorem property tax[1] on the Coggers' property, including the value of the land and the value of the manufactured home, porch, vinyl skirting, three storage sheds, and two wooden decks.[2] The assessor determined that the manufactured home was taxable as real property because it was similarly situated to other manufactured homes that Becker County taxed as real property. The Coggers appealed to the tax court.

The tax court held in favor of Becker County based on United States Supreme Court precedent, federal statutes, and state statutes. The most persuasive factor in the tax court's decision in favor of the County's authority to tax the Coggers' property was that the Coggers own the

---

1. "The essential characteristic of an ad valorem tax is that the tax is levied according to the value of property, as determined by an assessment or appraisal. * * * An ad valorem property tax is invariably based upon ownership of property * * *." 71 Am.Jur.2d State and Local Taxation § 18 (2001).

2. The assessment included taxation of the Coggers' garages; however, the Coggers and Becker County agree that the garages are properly classified as real property and subject to the ad valorem property tax.

land in fee patented title. The following factors were the basis for the court's finding that the manufactured home was real property: (1) the manufactured home was similarly situated to other such homes taxed as real property in the county, (2) the home was connected to a well and septic tank system, and (3) the Coggers used the home as their primary residence.

On appeal the Coggers concede, and Becker County agrees, that Congress has authorized states to tax real property held in fee by Indians and located within the boundaries of an Indian reservation. But the Coggers contend that Congress has *not* granted states the authority to define what property may be taxed as real prop-

erty. Becker County asserts that Congress has necessarily granted all real property taxing authority to the states, and the tax court acted properly when it applied Minnesota statutes in classifying the Coggers' property.

█ In Minnesota, the legislature has plainly defined real and personal property. Minn.Stat. § 272.03, subds. 1, 2 (2004).[3] The legislature has also defined when a manufactured home, and the structures annexed to it, should be classified as real property and when a manufactured home should be classified as personal property. Minn.Stat. § 273.125, subd. 8 (2004).[4] Under these statutes, the Coggers' manufac-

---

3. Minn.Stat. § 272.03, subd.1. *Real property.*

(a) For the purposes of taxation, "real property" includes the land itself, rails, ties, and other track materials annexed to the land, and all buildings, structures, and improvements or other fixtures on it, bridges of bridge companies, and all rights and privileges belonging or appertaining to the land, and all mines, iron ore and taconite minerals not otherwise exempt, quarries, fossils, and trees on or under it.

(b) A building or structure shall include the building or structure itself, together with all improvements or fixtures annexed to the building or structure, which are integrated with and of permanent benefit to the building or structure, regardless of the present use of the building, and which cannot be removed without substantial damage to itself or to the building or structure.

\*    \*    \*    \*    \*    \*

Subd. 2. *Personal property.* For the purposes of taxation, "personal property" includes:

\*    \*    \*    \*    \*    \*

(3) All improvements upon land the fee of which is vested in the United States, and all improvements upon land the title to which is vested in any corporation whose property is not subject to the same mode and rule of taxation as other property.

4. Minn.Stat. § 273.125, subd. 8. *Manufactured homes; sectional structures.*

(a) In this section, "manufactured home" means a structure transportable in one or more sections, which is built on a permanent chassis, and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and contains the plumbing, heating, air conditioning, and electrical systems in it. Manufactured home includes any accessory structure that is an addition or supplement to the manufactured home and, when installed, becomes a part of the manufactured home.

(b) A manufactured home that meets each of the following criteria must be valued and assessed as an improvement to real property, the appropriate real property classification applies, and the valuation is subject to review and the taxes payable in the manner provided for real property:

(1) the owner of the unit holds title to the land on which it is situated;

(2) the unit is affixed to the land by a permanent foundation or is installed at its location in accordance with the Manufactured Home Building Code in sections 327.31 to 327.34, and rules adopted under those sections, or is affixed to the land like other real property in the taxing district; and

(3) the unit is connected to public utilities, has a well and septic tank system, or is serviced by water and sewer facilities comparable to other real property in the taxing district.

tured home and adjoining property would properly be classified as real property.

■ We review tax court decisions to determine "whether the tax court lacked jurisdiction, whether the tax court's decision is supported by the evidence and is in conformity with the law, [or] whether the tax court committed any other error of law." *Jefferson v. Commissioner of Revenue,* 631 N.W.2d 391, 394 (Minn.2001); Minn.Stat. § 271.10, subd. 1 (2004).

Resolution of the issue raised by the Coggers requires a brief history of federal legislation with respect to Indians and reservation land. Congressional federal policy toward Indians and Indian land has gone through several transformations since it was first interpreted by the Supreme Court in *Worcester v. Georgia,* 31 U.S. (Pet.) 515, 8 L.Ed. 483 (1832). In *Worcester,* the Court stated that the federal policy with respect to Indians was to treat the Indian nations as "distinct political communities," with the federal government as the sole body of government authorized to interact with the Indians. *Id.* at 556–57; *see County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation,* 502 U.S. 251, 257, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992).

In 1887 the Indian General Allotment Act, commonly known as the Dawes Act, ch. 119, 24 Stat. 388 (repealed 2000), was enacted with the objective of facilitating the government's policy of Indian assimilation. *County of Yakima,* 502 U.S. at 254, 112 S.Ct. 683. The Dawes Act gave the President power to apportion almost all tribal land throughout the United States without first obtaining the consent of the affected Indian nation. *County of Yakima,* 502 U.S. at 254, 112 S.Ct. 683. The Dawes Act also limited alienation and encumbrance of specific tribal land by placing land in trust with the United States for at least 25 years. *County of Yakima,* 502

U.S. at 254, 112 S.Ct. 683. Once the 25-year period expired, an Indian allottee would receive fee patented title to the land and become subject to the civil and criminal laws of the state where the land was located. *Id.*

The Supreme Court addressed the Dawes Act's 25–year trust period in *In re Heff,* when it held that Indians would not become subject to the civil and criminal law of the state until the 25–year trust period had expired. *In re Heff,* 197 U.S. 488, 509, 25 S.Ct. 506, 49 L.Ed. 848 (1905). Congress affirmed the Court's interpretation of the Dawes Act with passage of the Burke Act in 1906, but added that when the President exercised his authority to issue fee patented title prior to expiration of the 25–year trust period, "all restrictions as to sale, incumbrance, or taxation of said land shall be removed." *County of Yakima,* 502 U.S. at 255, 112 S.Ct. 683 (citations omitted).

In an effort to return to the policy that dominated United States–Indian relations prior to the Dawes Act era, Congress passed the Indian Reorganization Act in 1934, 25 U.S.C. §§ 461–479 (2002). *County of Yakima,* 502 U.S. at 255, 112 S.Ct. 683. The objectives of the Indian Reorganization Act were to stop further allotment of Indian land, to indefinitely extend the existing period of trust, and to restore unalloted land to tribal ownership. *County of Yakima,* 502 U.S. at 255, 112 S.Ct. 683. The Supreme Court has held that the Indian Reorganization Act prevents states from taxing "reservation lands and reservation Indians" unless Congress has made it unmistakably clear that it intends to grant that power to the state. *County of Yakima,* 502 U.S. at 258, 112 S.Ct. 683. The Court concluded that when Congress rendered Indian lands capable of ownership in fee, "it also rendered them subject to assessment and forced sale for [state]

taxes." *Id.* at 263–64, 112 S.Ct. 683. With this history in mind, we proceed to decide the instant case.

The Coggers contend that Congress's grant of authority to the states to tax Indian real property is ambiguous because Congress has not specifically granted to the states the *power to define real property.* Thus, Congress has reserved for itself the power to define what Indian property may be considered real property. They propose that this court create a kind of "federal" definition of real property pursuant to "other statutes, common law, and common sense." The Coggers contend that this court-created definition of real and personal property would define their property as personal property and as such it would not be subject to state taxation. Becker County asserts that the authority to tax is statutory and varies from state to state; therefore, Congress must have contemplated that each state would tax Indian land in the same manner it taxed all other property within that state.

In *County of Yakima,* the Supreme Court addressed precisely whether Congress intended to authorize states to tax real property held in fee by Indians and located within reservation boundaries. Yakima County had attempted to foreclose on land located within the reservation in which the tribe or its members had an interest, where ad valorem taxes were past due. The Yakima Nation contended that federal law prohibited ad valorem taxes on fee patented land held by the tribe or its members. The Court looked to sections 5 and 6 of the Dawes Act to determine whether Congress granted states the authority to tax fee patented land. *County of Yakima,* 502 U.S. at 264, 112 S.Ct. 683. The Court reasoned that the Burke Act clarified the intent of Congress in sections 5 and 6 of the Dawes Act that "fee ownership would free the *land* of 'all restrictions as to sale, incumbrance, or taxation.'" *County of Yakima,* 502 U.S. at 264, 112 S.Ct. 683 (citations omitted). The Court concluded that Congress in the Burke Act proviso "manifested a clear intention to permit the state to tax such Indian lands" and held that the ad valorem property tax levied by Yakima County was valid. *County of Yakima,* 502 U.S. at 259, 112 S.Ct. 683 (citations omitted).

The *Yakima* Court made it clear that Congress intended to grant the states authority to assess ad valorem taxes on real property owned by Indians in fee title on Indian land. Congress did not define real or personal property in its grant of authority. We have previously held that "the power of taxation is inherent in sovereignty and * * * under our system of government it reposes in the Legislature * * *." *Bemis Bro. Bag Co. v. Wallace,* 197 Minn. 216, 222, 266 N.W. 690, 693 (1936). Implicit in the state's power to tax is the authority to define what property or goods to tax, subject of course to constitutional limitations. Thus, it follows that Congress granted to the states the authority to subject Indian land to its real property taxation scheme, including the authority to determine the definition of real property. The Coggers cite no federal or state authority to the contrary. We conclude that Becker County may apply Minnesota's definition of real property to the Coggers' property.

We hold that the tax court did not err when it applied the Minnesota statutes to the classification of the Coggers' property.

Affirmed.